1
2
3
4
5
6
7
8
9          **IN THE UNITED STATES DISTRICT COURT FOR THE**
10              **EASTERN DISTRICT OF CALIFORNIA**
11

12  **LAURA WILLIAMS,**                    )    **CV F 08-0405 AWI DLB**
                                            )
13              **Plaintiff**,              )
                                            )    **FINDINGS OF FACT AND**
14          **v.**                          )    **CONCLUSIONS OF LAW**
                                            )
15  **SUN LIFE ASSURANCE COMPANY OF** )
    **CANADA, SUN LIFE FINANCIAL,**        )
16  **COMMUNITY HOSPITALS OF**             )
    **CENTRAL CALIFORNIA dba**             )
17  **COMMUNITY MEDICAL CENTERS**          )
    **EMPLOYEE BENEFIT PLAN and**          )
18  **DOES 1-10**                          )
                                            )
19              **Defendants.**             )
    _____ )
20

21

22

23
            This is an action pursuant to the federal Employee Retirement Income Security Act of
24
    1974 ("ERISA"), 29 U.S.C. § 1001 et seq.  In this action, plaintiff Laura Williams
25
    ("Plaintiff") seeks to recover benefits she contends were wrongfully denied by defendant Sun
26
    Life Assurance Company of Canada ("Sun Life"), acting as claims administrator for
27
    defendant Community Hospitals of Central California dba Community Medical Centers
28

Employee Benefit Plan (collectively, "Defendants").  The parties in this case have completed discovery and have agreed that the case be submitted to the court for findings of fact and conclusions of law based on the administrative record as augmented by order of this court and with augmentation as stipulated by the parties.  Federal question jurisdiction exists pursuant to 28 U.S.C. § 1331.  Venue is proper in this court.

**PROCEDURAL HISTORY AND GENERAL FACTUAL BACKGROUND**

Plaintiff was, at all times relevant to this action, an employee of Community Hospitals of Central California ("Community Hospitals") covered under a disability insurance plan administered by Community Hospitals of Central California dba Community Medical Centers Employee Benefit Plain (hereinafter, the "Plan").  Defendant Sun Life functioned as the third-party insurer of the Plan and also functioned as the claims administrator.  Pursuant to the Plan, a participant is "Totally Disabled" for purposes of entitlement to long term disability benefits under the Plan if the participant is "unable to perform the Material and Substantial Duties of his own Occupation" "during the Elimination Period [of six-months] and the next 24 months."

Plaintiff was involved in a motor vehicle accident in September 2004 wherein she sustained spinal injuries.  Plaintiff underwent a disketomy in February 2005 and was able to return to work as a rehabilitation scheduler in May 2005.  On March 13, 2006, Plaintiff sustained a re-injury of her spine when the hydraulics in a chair in which she sat suddenly failed and "bottomed out," jarring her spine.  The following day, Plaintiff was seen by Dr. Rea Wong, M.D., ("Dr. Wong") the Medical Director for Occupational Health for Community Hospitals who examined Plaintiff and completed a Doctor's First Report of Occupational Health or Injury that reflected her conclusion that Plaintiff was unable to return to work and was disabled.  As part of the initial examination, Plaintiff received an MRI examination which was interpreted to "indicate a large left paracentral herniated disk with enhanced scarring that extends to and surrounds the left L1 nerve root.  Additionally,

2

1
2
3
4
5
6

[Plaintiff] has some posterior disk bulge at L5-S1 that contacts the undersurface of the L5 nerve roots bilaterally." (AR 234). On the basis of these findings, Plaintiff was referred to a neurologist, Dr. Alan Birnbaum, M.D. ("Dr. Birnbaum") for additional diagnostic work-up and management. Both Dr. Wong and Dr. Birnbaum examined Plaintiff on a number of occasions following the initial assessment and neither ever cleared Plaintiff to return to work. A more thorough discussion of Plaintiff's medical history will be undertaken below.

7
8
9
10
11
12
13

On November 14, 2006, Plaintiff applied for group disability benefits under the Plan. Sun Life, in its role as benefits administrator, denied the application on February 27, 2007, based on their determination that Plaintiff was not medically disabled from returning to her job during the entire Elimination Period from March 13, 2006 through September 11, 2006. Plaintiff appealed the denial under the Plan. On September 17, 2007, Sun Life affirmed the denial and informed Plaintiff that all administrative remedies had been exhausted. The complaint in the instant action was filed on March 19, 2008.

14
15
16
17
18
19
20
21
22
23

Plaintiff's first amended complaint was filed on April 17, 2008. On December 1, 2008, Plaintiff moved to amend the administrative record with a statement by Dr. Wong to clarify her intent with regard to an ambiguous form that had been submitted to Sun Life. During the pendency of that motion, Plaintiff filed the now-operative Second Amended Complaint ("SAC") on January 5, 2009. The court granted Plaintiff's motion to augment the Administrative record on March 9, 2009, and denied Defendants' motion to file a response to the amended Administrative record on July 8, 2009. Defendants' trial brief was filed on November 2, 2009. Pursuant to the stipulation of the parties, the court issued an order on January 27, 2010, submitting the matter on written briefs and on the administrative record without need for oral argument. Plaintiff submitted her trial brief on January 28, 2010.

24

**LEGAL STANDARD**

25
26

"[T]he default standard of review in ERISA cases is *de novo* and [. . .] discretion exists only if it is 'unambiguously retained.' [Citation.]". <u>Opeta v. Northwest Airlines</u>

27
28

3

1    Pension Plan, 484 F.3d 1211, 1216 (9th Cir. 2007) (citing Kearney v. Standard Ins. Co., 175

2    F.3d 1084, 1090 (9th Cir. 1999)).  The parties to this case agree that the court's review in this

3    case should be de novo.  The parties have also stipulated that the case be tried to the court on

4    the basis of submitted trial briefs without oral argument.  Bench trial on the record before the

5    plan administrator subject to the court's discretionary power to consider evidence extraneous

6    to the administrative record where necessary is appropriate.  See Kearney 175 F.3d at 1094 -

7    1095 ("guided by [Mongeluzo v. Baxter Travenol Disability Benefit Program, 46 F.3d 938

8    (9th Cir. 1995)], the district court may try the case on the record that the administrator had

9    before it.") The question before the court in a bench trial is not whether there is an issue of

10   material fact as is the case in a motion for summary judgment; rather, the court evaluates "the

11   persuasiveness of conflicting testimony and decide[s] which is more likely true."  Id. at 1095.

12         Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the court must "find

13   the facts specially and state its conclusions of law separately."  "One purpose behind Rule

14   52(a) is to aid the appellate court's understanding of the basis of the trial court's decision.

15   [Citation.] This purpose is achieved if the district court's findings are sufficient to indicate

16   the factual basis for its ultimate conclusions.  Vance v. American Hawaii Cruises, Inc., 789

17   F.2d 790, 792 (9th Cir. 1986). The district court is not required to base its findings on each

18   and every fact presented at trial, id., neither is the court required to state findings as to

19   undisputed allegations.  Nuelsen v. Sorensen, 293 F.2d 454 (9th Cir. 1961).

**FINDINGS OF FACT**

20

21   1.    Plaintiff was an employee of Community Hospitals of California ("Community"), an

22         entity that sponsored an ERISA-governed employee disability plan (the "Plan") for

23         eligible employees, the benefits of which were funded through a group long term

24         disability policy issued by Sun Life Assurance Company of Canada ("Sun Life").  Sun

25         Life functioned as the Plan claims administrator that reviewed and decided the claim

26         submitted by Plaintiff.

27

28                                          4

2.      Plaintiff was employed by Community as a Rehabilitation Scheduler.  Plaintiff was, at all times relevant to this action, an enrolled member of the Plan through Community's compensation package.  Plaintiff paid an additional premium to the Plan for enhanced coverage that would entitle her to benefits payments equal to 66% of her pre-disability pay (less offsets) if Plaintiff were to become disabled.

3.      Pursuant to plan provisions, a plan participant is "totally disabled" and therefore entitled to plan benefits if "during the Elimination Period and the next 24 months, the employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation.  After Total or Partial disability benefits combined have been paid for 24 months, the Employee will continue to be Totally Disabled if he is unable to perform with reasonable continuity any Gainful Occupation for which he is or becomes reasonably qualified for by education, training or experience . . . .  To qualify for benefits, the Employee must satisfy the Elimination Period with the required number of days of Total disability, Partial Disability or a combination of days of Total and Partial Disability."  The Elimination Period was 180 days which includes the time interval between March 15, 2006, and September 11, 2006.  (AR 65).

4.      Plaintiff's Long Term Disability claim identified Plaintiff's job as requiring 7 hour of sitting per day, approximately one-half hour each of standing and walking.  The form identifying the physical aspects of Plaintiff's work specified that each of the activities, standing, walking and sitting, were performed "at will."  Plaintiffs' job was also identified as requiring occasional bending, and occasional push/pull motions.  Plaintiff's job also required the ability to lift 10 pounds and carry 5 to 10 pounds.  (AR 100).

5.      Plaintiff's relevant medical history is summarized by a patient history taken by Dr. Berjt T. Kalamkarian, M.D., of the Comprehensive Pain Management Center.  The

5

1  history reveals that Plaintiff reported "a history of motor vehicle accident following

2  which she underwent surgery by Dr. V. Roy Smith at the L5-S1 level.  She went back

3  to work in May of 2005.  On March 13, 2006, while sitting on her chair, the hydraulic

4  [lift mechanism] failed and [Plaintiff] fell on her back severely aggravating her pain

5  going down to the lower extremities with numbness of the left foot."  (AR 207).

6      6.    Plaintiff was seen by the Community's Employee Health Service the following day,

7  March 14, 2006, where she reported having felt a "jolting sensation" at the time of the

8  accident, followed later that night by the development of pain radiating to her left

9  knee with leg numbness and weakness.  Plaintiff was referred to Dr. Wong M.D.,

10  Medical Director of the Occupational Health and Wellness Department for

11  Community.  (AR 262).  Plaintiff was determined to be Temporarily Disabled as of

12  March 14, 2006.  (AR 262).

13      7.    The Doctor's First Report of Occupational Injury or Illness ("First Report") is dated

14  March 14, 2006.  The First Report declares Plaintiff disabled through March 16,

15  2006.

16      8.    Plaintiff was subsequently seen a number of times by Dr. Wong, including the dates

17  of March 16, 2006 (AR 330), March 20, 2006 (AR 329), March 21, 2006 (AR 331),

18  March 28, 2006 (AR 322), July 7, 2006 (AR 313), September 6, 2006 (AR 308),

19  October 10, 2006 (AR 302) and November 7, 2006 (AR 299).  Significantly for

20  purposes of this discussion, Plaintiff's period of Temporary Disability was extended

21  through March 20, 2006, on the visit of March 16, 2010; was extended through March

22  21, 2006, on the visit of March 20, 2006; and was extended through April 11, 2006,

23  on the visit of March 28, 2010.  On the visit of March 21, 2006, Plaintiff was referred

24  to Dr. Alan Birnbaum, a neurologist.

25      9.    Plaintiff was examined by Dr. Birnbaum on April 4, 2006.  Dr. Birnbaum noted:

26          Mrs. Williams unfortunately by simple observation alone has
        tolerance of seating far too inadequate to allow anything for not

27

28

save continuation of temporary total disability. The chances of
her reaching maximum medical improvement prior to
September of this year seem poor.

10. On a follow-up evaluation performed on May 9, 2006, Dr. Birnbaum recommended
that Plaintiff remain off-work until approximately June 15, 2006. (AR 287). An
examination by Dr. Birnbaum on June 22, 2006, extend the period of disability to
August 1, 2006. (AR 285). On September 6, 2006, Dr. Birnbaum noted problems
with pain control, recommended the use of longer-acting pain medications, and
deferred determination of continuing temporary disability to Dr. Wong. (AR 282).
On December 12, 2006, Dr. Birnbaum noted continuation of problems with pain
management and noted the need for further imaging tests and possibly a repeat EMG.
(AR 280).

11. On May 26, 2006, Plaintiff received a neurosurgical consultation by a Dr. Ali Najafi,
M.D. Dr. Najafi's consultation report discusses then-current MRI findings including
"Postoperative changes with mild-to-moderate dusk bulge at the L5-S1 with
enhancing scar tissue in the left epidural space. There is a circumferential disk bulge
at the L4-L5 with mild-to-moderate narrowing of the foramen." (AR 352).

12. Between August 7, 2006, and November 28, 2006, Plaintiff was further evaluated by
a Dr. Berj Kalamakrian M.D. for control of pain. Dr. Kalamakarian's report echoed
the report by Dr. Najafi and, in addition, observed that Dr. Birnbaum had performed
electrodiagnositc studies on or about August 3, 2006, that revealed abnormalities
compatible with a diagnosis of left S1 Radiculopathy. (AR 201). Dr. Kalamakarian
also noted that Plaintiff was taking the maximum allowable dose of Tylenol and
Vicodin without achieving adequate pain relief. Id.

13. On November 28, 2006, Dr. Kalmkarian performed an epidural steroid injection into
the L4 - L5 space.

14. On February 1, 2007, Dr. Wong completed an Attending Physician Statement

("APS"), which is a pre-printed form supplied by Sun Life.  The APS included the

following notation:

A.  In a normal day, the patient may:

    1.  Stand/Walk      ☐ None     [x] 1-4 hours   ☐ 4-6 hours   ☐ 6-10 hours

    2.  Sit              [x] 1-3 hours   ☐ 3-5 hours   ☐ 5-10 hours

    3.  Drive           [x] 1-3 hours   ☐ 3-5 hours   ☐ 5-10 hours

The APS also indicated Plaintiff's level of physical impairment was "Moderate level

of functional capacity capable of clerical administrative (sedentary) activity.  The APS

quantified the level of impairment as 60% to 70%.  The APS indicated that the listed

disability limitations would apply for 4 to 6 months, but also indicated that Plaintiff

was awaiting a neurosurgical consult and that the extent of impairment would not be

known until after the consult.  (AR 380).

15.  Sun Life submitted Plaintiff's medical record for review by a Dr. Sarni on February

14, 2007, presumably in conjunction with Plaintiff's application for long term

disability benefits.  Dr. Sarni reviewed the medical records generated by Drs. Wong,

Birnbaum, Najafi and Kalamkarian.  Generally, Dr. Sarni appears to have accurately

summarized the medical histories, observations and treatments of Plaintiff's treating

physicians.  Dr. Sarni's report noted in particular the office notes by Dr. Wong dated

from March 28, 2006, to November 7, 2007.  Dr. Sarni notes that Dr. Wong's office

notes from November 7, 2006, includes the "key element" reflecting that "Dr. Wong

noted Dr. Kalamkarian adjusted the medication and added Lyrica, which has

reportedly helped [Plaintiff] quite a bit.  Dr. Wong reports that this has greatly

improved [Plaintiff's] pain."  (AR 391).

16   Dr. Sarni's report concluded as follows:

No pathology has been identified as a result of that fall that occurred in March
2006, but it is reasonable to conclude that the underlying surgical pathology,
specifically the scar tissue around the nerve root, was exacerbated as a result
of that fall.  This type of exacerbation and flare-up of pain does not show up

8

on objective studies such as an MRI.

I believe that it was reasonable to grant the insured several months' temporary disability at the time of the fall. Generally, such flare-ups are self-limiting and individuals can resume there routine level of activity within three months maximum.

Certainly by 9/11/06, which is approximately six months after the incident, one would expect the insured to be back to baseline. Furthermore, as indicated on the 11/7/06 office note by Dr. Wong, the insured was started on Lyrica and this significantly helped her pain as well.

In summation, it is reasonable to conclude theat the insured did sustain a significant flare-up of her underlying pathology as a result of the incident in March 2006 and it would be reasonable to grant her a period of 2 - 4 months of temporary total disability while allowing the flare-up to calm down. However, there is not data to indicate that it would be unsafe for her to perform her duties of her occupation after that time period. (AR 391 - 392).

17. Plaintiff's claim for long term disability benefits (the "LTD claim") was denied on February 27, 2007. The denial was based on Sun Life's conclusion that Plaintiff "was not precluded [. . .] from performing her occupation throughout the entire elimination period of March 15, 2006 through September 11, 2006. Plaintiff appealed the decision.

18. As part of the process of review and appeal of Plaintiff's LTD claim, Plaintiff's medical record was reviewed at Sun Life's request by Dr. Victoria Langa, M.D., an orthopedic surgeon. Dr. Langa's report was prepared in August 31, 2007. Dr. Langa repeated many of the observations already mentioned. In addition, Dr. Langa summarized information that became available after Sun Life's denial of Plaintiff's LTD claim on February 27, 2007. Of some significance Dr. Langa observed:

Although an initial lumbar MRI obtained on March 24, 2006 reportedly documented primarily postoperative changes on the left at L5 - S1 with scarring in combination with a residual bulging L5 - S1 disc resulting in moderate-to-severe left neural foraminal stenosis, an evidential updated lumbar MRI on March 17, 2007, by report, did document a recurrent left-sided disc herniation at L5 - S1 would have been consistent with [Plaintiff's] recurrent left radicular low back symptomology and would have been consistent with the neurologic findings documented by Dr. Najafi in May 2006. [Plaintiff] eventually underwent surgery on July 12, 2007 consisting of a redo left L5 -S1 microdiscectomy for the diagnosis of a recurrent L5-S1 disc herniation with radiculopathy. (AR 441)

19.   Dr. Langa's report concluded as follows:

> At issue is [Plaintiff's] ability/inability to perform full-time sedentary work activities from march 13, 2006 to the present time. Firstly, in my opinion, with a documented recurrent L5-S1 disc herniation in combination with rediculopathy , it is believable that [Plaintiff] would have difficulty sitting continuously for prolonged periods of time. Individuals with documented disc herniations often report intolerance to prolonged periods of sitting. On the other hand, individuals with documented disc herniations will often tolerate sitting if they are allowed change of position as necessary to occasionally, briefly, stand/stretch/walk about before returning to the sitting position. Dr. Wong's records from September 2006 document [Plaintiff's] reporting that she was unable to sit for longer than 45 minutes at a time and Dr. Wong's later Attending Physician's Statement of February 01, 2007 allowed sitting of one to three hours and driving of one to three hours in an eight-hour workday (which combined would result in up to six hours of sitting in an eight-hour workday). The occupational analysis that was performed reflected that [Plaintiff's] usual job would be preformed primarily in the sitting position with brief periods of standing/walking. Putting all of this information together, I would conclude that prior to the July 12, 2007 surgery, [Plaintiff] should have been able to perform a sedentary job that allowed her to change position as necessary with sitting up to 45 minutes at a time and up to approximately six hours in an eight-hour workday. (AR 441).

20.   Plaintiff's appeal of the denial of LTD benefits by Sun Life was upheld by Sun Life's appeals process on September 17, 2007.

21.   Plaintiff filed her complaint in the instant action on March 19, 2008.

22.   On December 1, 2008, Plaintiff moved to augment the administrative record. Plaintiff contended that Sun Life had created an ambiguity by constructing the APS so that it was not clear to the evaluating physician whether the categories of activities could be engaged additively or whether each notation in each category was intended to reflect the most work the patient could tolerate in a workday exclusive of any other type of work. The court granted Plaintiff's motion to augment the record. Defendants summarize Dr. Wong's declaration noting, "Dr. Wong claims that the APS did not provide her with the option of indicating that [Plaintiff] could only sit for one to three hours if she continued taking large doses of pain medication. For the first time, Dr. Wong opined that [Plaintiff] was unable to perform any occupational task due to the use of pain medication." Doc. # 54 at 11:13 - 18.

**CONCLUSIONS OF LAW**

**I. Conclusions Regarding the APS and Dr. Wong's Supplementary Declarations**

On March 3, 2009, the court issued a memorandum opinion and order granting

Plaintiff's motion to Augment the Administrative Record with a declaration or declarations

by Dr. Wong clarifying the intent of her responses to the APS.  In that memorandum opinion

and order the court reasoned:

> The court agrees that, contrary to Defendants' opposition, the Attending
> Physician Statement form is inherently ambiguous.  First, as Plaintiff points
> out, it is not clear whether an entry in one category is intended to be
> considered inclusively with entries in other categories or exclusive of any
> other entry.  Second, with respect to the closely linked activities of sitting and
> driving, there is a substantial difference between 1 and three hours.  Thus, an
> Attending Physician Statement that is filled out by checking the 1-3 hour
> boxes for both sitting and driving could be interpreted as indicating that the
> insured could sit for one hour <u>or</u> drive for one hour; or it could be used to
> indicate that the insured could sit for three hours <u>and</u> sit or drive for an
> <u>additional</u> three hours in a routine work day.  Or anything in between.  The
> court has reviewed the Attending Physician Statement [. . . ] and finds there is
> nothing internal to the form that would indicate that one or the other end of the
> substantial range of interpretations of the insured's functional capability is
> proper.

Doc. # 39 at 5:2-14.

As previously noted, declarations by Dr. Wong indicate that it was her intention at the

time she filled out the APS to communicate her assessment that Plaintiff could only sit for

one to three hours if she continued taking large doses of pain medication and was unable to

perform any occupational task due to the use of pain medication."  Defendants argue

strenuously that the court should grant little or no credence to Dr. Wong's declarations based

on the possibility that Dr. Wong, out of a perceived professional duty or as a result of

personal sympathy, could be offering now a different interpretation of her findings than what

she intended to communicate at the time the APS was completed.

Defendants offer two lines of reasoning to support their contention that the court

should not accept Dr. Wong's "revised" version of Plaintiff's assessment as communicated in

the APS.  First, Defendants contend that Dr. Wong's opinions as expressed in her

11

declarations should be disregarded because they are directly contradicted by the response she

made at response number 6(f) of the APS where Dr. Wong checked the "yes" box in answer

to the question "Can the employee work an 8 hour day with the above restrictions?"  The

"above restrictions" here refers to the responses noted above to questions regarding the

number of hours per day the employee can sit, drive, or stand/walk.

The court reiterates its finding that the APS, a form generated and used by Sun Life, is

prone to considerable ambiguity with respect to answers to questions it poses and did, in fact,

generate considerable ambiguity in this case.  The court's observations regarding the

ambiguities inherent in question 6(A) which requests the amount of time an employee can

stand/walk, sit or drive remain the same now as they were when the above-quoted

observation was made in the court's memorandum opinion and order of March 3, 2009.  The

court also notes that question 6(A) is also ambiguous in that if it were the intention of an

examining physician to indicate that the employee could not sit or drive any appreciable

amount of time or less than one hour, there is no response option that corresponds to that

assessment.

The court also finds that question 6(F) does not resolve the ambiguity engendered by

answers to questions 6(A), (B), (C), or (D).  It is not clear whether the "above restrictions"

includes the need for medications that are noted in question 4, or whether it refers only to the

responses in question 6.  Further, a physician's notation that an employee could work an 8-

hour day subject to the above listed restrictions does not mean necessarily that the employee

could work an 8-hour day at *their* job if the restrictions listed were incompatible with the

performance of that job.

To the extent Dr. Wong's answers on the APS to questions 6(A) and 6(F) are

inconsistent with her interpretation of the APS given in her Declarations, there are two

possibilities.  Either the entries on the APS were not erroneously made and it was Dr. Wong's

intent to convey an assessment that Plaintiff could work an 8-hour day a combination of

12

sitting/driving and standing/walking, or the entry at question 6(F) was made erroneously, either by inadvertence or though a misunderstanding or misperception of the question. The court allowed augmentation of the Administrative Record because it concluded that the construction of the questions on the APS, particularly question 7, was prone to ambiguity. The court further agrees with Plaintiff that the structure of some questions in the APS fail to elicit, or may discourage entry of, relevant explanatory information and invites the sort of responses that require further explanation. Having previously found that the structure of the questions constructed by Sun Life and answered by Dr. Wong warranted further explanation to enable the court to determine what information Dr. Wong intended to communicate, the court is not inclined to now disregard that information because it is inconsistent with an interpretation favored by Defendants.

Defendants also offer a number of bases upon which they invite the court to speculate that Dr. Wong, either through a sense of duty to her patient or through sympathy to her efforts to recover LTD benefits has engaged in an impermissible revision of her initial assessment as reflected in the APS when she stated for the first time in her declaration that Plaintiff could not sit for more than a few hours a day nor work for an 8-hour day because of amount of medication that was required to manage her pain. The court declines Defendants' invitation to speculate on the veracity of Dr. Wong's declarations. First, there is no evidence external to the APS to suggest that Dr. Wong's later declarations are revisionary. Basically, the administrative record between March 14, 2006, and the end of November of 2006 is consistent with the explanations offered by Dr. Wong in her declarations that Plaintiff was unable to work an 8-hour day because of pain that was aggravated upon sitting and was poorly controlled by maximum daily doses of Vicodin and Tylenol.

The court is also not persuaded by Defendants' reliance on Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003) ("Nord"), as support for their contention that the court should look askance at the opinions expressed in Dr. Wong's declarations. In Nord, the

13

Supreme Court held the "treating physician rule," does not apply in the context of courts' reviews of ERISA claims. Id. at 829. The treating physician rule compels claims administrators who reject the opinions of a treating physician "'to come forward with specific reasons for his decision, based on substantial evidence in the record,'[Citation]." Id. at 828 (noting the Ninth Circuit's decision in Regula v. Delta Family-Care Disability Survivorship Plan, 266 F.3d 1130 (9th Cir. 2001) applying the treating physician rule to ERISA cases). In overturning the Ninth Circuit's approach to ERISA cases, the Supreme Court held the treating physician rule applied in Social Security cases because rules in the Social Security program demand it; however the application of the treating physician rule is not warranted by ERISA or by any other legislative regulation. Id. at 829.

Contrary to Defendants' representation, the holding in Nord is the product of statutory interpretation and not the product of concern over inappropriate bias by treating physicians. While the Supreme Court acknowledged the possibility of such bias, it did so in the context of recognizing that logic no more demands that courts presume bias on the part of consultants hired by an ERISA plan than it demands courts presume bias by the patient's own physician. See id. at 832 ("And if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so [too] a treating physician, in a close case, may favor a finding of 'disabled'"). While the court is aware that such bias in an ERISA case may exist on either side, the court declines Defendants' invitation to suppose any such bias in the absence of any evidence other than Dr. Wong's willingness to clarify and, where necessary correct, her responses to Sun Life's APS form.

The court concludes that Dr. Wong's assessment of Plaintiff's condition as of February 1, 2007, is reflected in her responses to the APS form *as modified, augmented or corrected by her later declarations*. Accordingly, the finds it was Dr. Wong's opinion as of February 1, 2007, that Plaintiff could sit for one to three hours at a time and that she was disabled from her work by reason of requiring large doses of pain-killers which were only

14

1   partially effective in alleviating her pain.

2        In a similar vein Defendants ask the court to strike four "extraneous facts" that were

3   never "filed with the court or produced to Defendants' counsel." These "extraneous facts"

4   are found in Plaintiff's trial brief (Doc. # 56) at pp. 4, fn.1; 7:20 - 21 fn.2; 8:26-28; and 9:16

5   fn.3. The first references a repeat EMG study taken on March 22, 2007; the second

6   references a more extensive surgical procedure that was undertaken in August 2008 including

7   laminectomy and fusion; the third and fourth extraneous facts reference the fact that Plaintiff

8   remained under the care of Drs. Wong and Birnbaum after December 2006 but that medical

9   records for 2007 were not requested by Sun Life. In the discussion that follows, the court

10  does not rely on any of the extraneous facts for purposes of supporting its conclusions of law.

11  The facts will therefore be disregarded.

12  **II.  Plaintiff was Disabled During Exclusion Period**

13        The elimination period ran from March 15, 2006 through September 11, 2006.

14  During that period, Plaintiff was attended by Drs. Wong, Birnbaum, and Najafi who

15  individually and collectively documented Plaintiff's inability to return to work and heavy

16  dependence on pain relievers from the beginning of the exclusion period until at least August

17  1, 2006. Beginning on August 7, 2006, Plaintiff was attended by a pain specialist, Dr.

18  Kalmakarian, who noted the continuation of Plaintiff's pain despite maximum doses of

19  Vicodin and Tylenol. Dr. Kalamakarian also noted the correlation of prior diagnostic studies

20  with the diagnosis of left S1 radiculopathy. Dr. Birnbaum noted problems with pain control

21  on September 6, 2006, and recommended longer-acting pain medications. Presumably an

22  additional pain reliever, Lyrica, was added to Plaintiff's treatment regimen sometime

23  between September 6, 2006, and Dr. Wong's notation of November 7, 2006, noting some

24  improvement as a result of the Lyrica. However, the fact that Plaintiff required a subsequent

25  epidural steroid injection on November 28, 2007, indicates that the pain relief achieved by

26  the addition of the Lyrica was marginal.

27

28                                                         15

Dr. Sarni's report of February 14, 2006, notes both the medical histories of Plaintiff's treating physicians fairly accurately but his analysis of Plaintiff's condition is based almost exclusively on a generalized *prognosis* of improvement within 4 to 5 months from the time of the accident.  While Dr. Sarni's report documents the *expectation* that "one would expect the insured to be back to baseline" within the elimination period, there are no references to any progress notes or attending physician notes from within that period to bolster the claim that Plaintiff did, in fact, return to baseline.

It is difficult to harmonize the portions of Plaintiff's medical history that Dr. Sarni recounts in his report with the conclusion that Plaintiff returned to her baseline condition within the elimination period.  Dr. Sarni's report acknowledges that Plaintiff had x-rays, an MRI and an abnormal nerve conduction study, all consistent with her diagnosis of left S-1 radiculopathy.  He also noted the epidural injection of steroids performed on September 12, 2006, and that Plaintiff reported no significant relief as a result of the injection.  Dr. Sarni's report notes that the repeat nerve conduction study of August 3, 2006, was still abnormal although he observed that the fact there was no evidence of acute denervation "which was a favorable *prognostic* step."  (AR 391) (italics added).  Dr. Sarni's report also noted Plaintiff was taking six to ten Vicoden per day for pain control.  Notwithstanding these observations, Dr. Sarni concludes that Plaintiff should have been able to perform her duties after a recovery period extending no further than the middle of July 2006.

As far as the exclusion period is concerned, the court can find nothing in Dr. Sarni's report that highlights objective findings suggestive of any improvement at all within the exclusion period.  The one notation regarding improvement in response to Lyrica is from an office visit that occurred after the elimination period ran and that, in any event, probably does not have the significance that Dr. Sarni attached to it in view of the subsequent need for epidural steroid injection.  Dr. Sarni's report also appears to acknowledge the fact Plaintiff required large amount of analgesics in order to achieve a level of pain relief that was

16

incomplete, but he does not factor that observation into his conclusions.  The court concludes

Dr. Sarni's Report does not lend any substantial support to the contention that Plaintiff was

not disabled during the entirety of the elimination period.

Dr. Langa's review is similarly deficient in its support of Plaintiff's contention that

Plaintiff was not disabled during the entirety of the elimination period.  Like Dr. Sarni's

review, Dr. Langa's review appears to include Plaintiff's pertinent medical history from

March 13, 2006, to the date of the report, which was August 31, 2007.  Dr. Langa

acknowledges an underlying pathology of disc herniation and appears to acknowledge that

Plaintiff's complaints of pain upon continuous seating are compatible with that diagnosis.

However, Dr. Langa's review, like Dr. Sarni's, ends up looking primarily to prognosis rather

than to Plaintiff's individual medical history to reach its very generalized conclusion that

Plaintiff "could have performed primarily sedentary work activities that did not require her to

sit for longer than 45 minutes at a time or sit for longer than six hours of an eight-hour day."

(AR 442).

Dr. Langa's conclusion are based primarily on two contentions.  The first is a

prognostic observation that "[i]ndividuals with documented disc herniations will often

tolerate sitting if they are allowed change of position as necessary to occasionally, briefly,

stand/stretch/walk about before returning to the sitting position."  (AR 441).  Langa's second

contention consists of his interpretation of Dr. Wong's APS as saying that her responses

indicated that Plaintiff was capable of sitting six hours per day in aggregate in an eight-hour

workday.

Because the court has found that Dr. Wong's opinion regarding Plaintiff's condition

in the APS was as expressed in her subsequent declarations, the court must find that Dr.

Langa's reliance on the APS is misplaced.  As of February 2007 it was Dr. Wong's opinion

that Plaintiff could only sit for one to three hours if she continued taking large doses of pain

medication and that Plaintiff was unable to perform any occupational task due to the use of

17

pain medication.  What remains to support Dr. Langa's conclusion, then, is the generalized prognostic observation that individuals with disc herniation "often tolerate" sitting so long as frequent shifts of position are allowed.  As with Dr. Sarni's review of Plaintiff's record, the conclusions are not supported by the record itself or by the reviewers direct examination of the Plaintiff but by the prognostic observations the reviewers impose on the diagnostic information presented in the record.

It is instructive to note that the Supreme Court's decision in <u>Nord</u> to not apply the treating physician rule in an ERISA case arose in a factual context where the consulting physician hired by the plan *actually examined* the insured.  <u>Nord</u>, 538 U.S. at 827.  Such is not the case here.  Neither Dr. Sarni nor Dr. Langa ever personally examined Plaintiff nor do their conclusions appear rooted in the observations of physicians who did directly treat Plaintiff.  While the decision in <u>Nord</u> removes the obligation of courts to give weight to the opinions of treating physicians over consultants, it does not oblige courts to credit the opinions of consultants over treating physicians where the opinion of the consultants appears to be little more than educated conjecture.  <u>See also</u>, <u>Jebian v. Hewlett-Packard Employee Benefits Organization Income Protection Plan</u>, 349 F.3d 1098, 1109 fn.8 (9th Cir. 2003) (under *de novo* review, a district court may "take cognisance of the fact (if it is a fact in a particular case) that a given treating physician has a 'a greater opportunity to know and observe the patient' than a physician retained by the plan administrator").  Essentially, the opinions of both Drs. Sarni and Langa reflect the reviewing physicians' *expectations* of how a patient with Plaintiff's diagnosis *should* respond to treatment.  Neither opinion points convincingly to actual medical observations made during the elimination period that give strong support to Defendants' contention that Plaintiff was not disabled during the entirety of the elimination period.

Based on the record before the benefits administrator at the time the decision to deny LTD benefits was made, and based on Dr. Wong's declarations clarifying the entries she

made on the APS, the court concludes Plaintiff was disabled during the entirety of the elimination period.

**III. Plaintiff's Disability Status Following the Elimination Period**

Pursuant to the Plan, Plaintiff became eligible for LTD benefits at the end of the exclusion period, that is after September 11, 2006, and continuing for the duration of time she was unable to perform the duties of her own occupation, for up to twenty-four months. The parties agree that after the initial 24-month period, a different standard of disability applies. The initial 24-month LTD benefits period ended on September 11, 2008. Defendants contend that in the event the court finds the decision to deny LTD benefits was erroneous because Plaintiff was, in fact, disabled from performing the duties of her own job during the entire exclusion period, the matter should be remanded for further fact finding. Plaintiff contends that the court should grant the full 24-months of LTD benefits upon the record as it currently stands.

Plaintiff alleges, and Defendants do not dispute that Defendants only requested medical records through December 2006. The record before the court does, however, contain documents that are relevant to Plaintiff's level of disability between September 11, 2006, and July 12, 2007, when, according to Dr. Langa's report of August 31, 2007, Plaintiff underwent a redo left L5-S1 microdiscectomy to treat her recurrent L5-S1 disc herniation with radiculopathy. Plaintiff was seen by Dr. Birnbaum on December 12, 2006. During that visit, Dr. Birnbaum noted that Plaintiff received "no results" from the first epidural injection on September 12, 2006, and underwent a second injection on November 28, 2006. Plaintiff reported "a lot of pain since then." (AR 279). Dr. Birnbaum noted that Plaintiff was taking Norco, Dolobid, and Flexeril for pain as well as Lyrica, and was taking the maximum allowable dose of Norco. Dr. Birnbaum noted that Plaintiff's pain relief was incomplete and noted that Plaintiff might yet need a long-acting opioid. Dr. Birnbaum ordered Plaintiff to remain off work for three months.

On or about April 20, 2007, Plaintiff was examined by Dr. Ames of the University of California Medical Center in San Francisco.  Dr. Ames noted Plaintiff's prior, mostly unsuccessful treatments for pain relief and noted that Plaintiff "still is very severely symptomatic with sciatica-type pain, bilateral buttock pain, pain down her legs and also some component of pain in the [illegible] of her low back."  (AR 413).  Dr. Aims recommended a 2-level laminectomy and fusion at L5-S1.  Plaintiff sought a second opinion to see if a less radical procedure would offer the same benefits.  Plaintiff was subsequently seen on June 1, 2007, by Dr. Jongsoo Park, a neurosurgeon at Stanford Hospital who recommended a microdiscectomy. (AR 416).  The record indicates the microdiscectomy surgery was undertaken on July 12, 2007.  There is no indication that Plaintiff's condition improved between April 20, 2007, and July 12, 2007.

After July 12, 2007, the record before the court is sparse.  Dr. Langa's review of Plaintiff's medical record dated August 31, 2007, indicates Plaintiff was "functionally impaired from work" from her surgery on July 12, 2007, to that date.  This corresponds to Plaintiff's account of her own condition communicated to Sun Life in a letter dated August 2, 2007, wherein she reports being in a lot of pain during her recovery from the procedure of July 12, 2007.  (AR 408).  The court, based on Dr. Langa's evaluation of Plaintiff's status and based on Plaintiff's own subjective report of her level of pain, concludes that Plaintiff was disabled from the performance of the duties of her job continuously from the first date of the exclusion period on March 15, 2006, through the date of final determination of ineligibility on September 17, 2007.

## IV. Remand

Plaintiff requests the court order the payment of LTD benefits for the entirety of the 24-month period of disability from her own occupation.  Defendants request that the matter be remanded for further consideration of all the facts.  Defendants contend that there are "significant additional facts and evidence before the court and advanced by [Plaintiff] that

were not part of the record before Sun Life when it decided [Plaintiff's] claim".  Doc. # 57 at

9:5-7.  These additional facts include Dr. Wong's declarations clarifying her response to the

APS and opining that Plaintiff could not sit, drive, stand or walk for a total of more than three

hours per day and that the level of pain relievers required made her unable to perform the

requirements of her job.  In addition, Defendants list as additional facts the report of the

second EMG study done on March 22, 2007; the fact that Plaintiff had the laminectomy and

fusion in August 2008; the information that Plaintiff continued to be treated by Dr.

Birnbaunm in 2007; and the fact that Dr. Wong continued to treat Plaintiff after 2006, and

continued to believe that Plaintiff was unable to perform the duties of her job.

Defendants cite three cases for the proposition that where a district court finds a plan

administrator wrongly decided to deny benefits partly on the basis of evidence not before the

plan administrator at the time of the decision, the matter should be remanded to the

administrator for further consideration.  The cases cited by Defendants are Saffle v. Sierra

Pacific Power Co. Bargaining Unite Long Term Disability Income Plan, 85 F.3d 455 (9th cir.

1996); Patterson v. Huges Aircraft Co., 11 F.3d 948 (9th Cir. 1993); and Kistler v. Financial

American Group Long Term Disability Plan, 35 Fed.Appx. 516 2002 WL 1000125 (9th Cir.

2002).  Saffle, the lead case of the trio, illustrates the critical distinction between the cases

cited by Defendants and the present case:

> We have previously indicated that remands to the factfinder are appropriate in
> similar circumstances.  In [Patterson], after holding that the Plan was
> ambiguous and incorrectly construed we instructed the district court to remand
> to the administrator for a factual determination consistent with our opinion on
> plan interpretation.  And in Mongeluzo v. Baxter Travenol Long Term
> Disability Benefit Plan, 46 F.3d 938 (9th Cir. 1995), where the district court's
> review was de novo because, unlike this Plan, the benefit plan did not confer
> discretion on the administrator, we held that the terms of the plan construed in
> accordance with Pattterson required reevaluation of the evidence and so we
> remanded *to the district court* for a factual determination under a proper
> construction of the terms of the plan.

Saffle 85 F.3d at 460 - 461 (italics added).

Based on the Ninth Circuit's holding in Saffle the court finds that it is the rule in this

circuit that where the district court reviews the denial of LTD benefits under an ERISA plan under the *de novo* standard, the court may apply whatever facts it has deemed necessary for adequate review to reach the factual determination regarding the disability of the insured under the terms of the plan.  Remand for such determination is not appropriate.  See Jebian, 349 F.3d at 1110 fn.9 (acknowledging the distinction set forth in Saffle and Mongeluzo that requires remand for factual determination under the appropriate standard where the standard is abuse of discretion, but not where the district court's standard of review is *de novo*).

On the other hand, Plaintiff cites Prado v. Allied Domecq Spirits Group Disability Income Policy, 2008 WL 191985 (N.D. Cal. 2008), for the proposition that a district court, even under an abuse of discretion standard need not remand to the administrator where the plan administrator had all the facts before it but abused its discretion in reaching a decision to deny LTD benefits.  In Prado, the Northern District granted LTD benefits based on the determination that the plan administrator had abused its discretion in disregarding information provided by the employer and improperly discounting the plaintiff's subjective reports of continuing pain to reach a decision to deny benefits.  Rather than remand for further consideration, the Prado court directly ordered an award of benefits for the first 24-month period of disability but declined to grant the plaintiff's request for a grant of extended benefits beyond the initial 24-month period.  Id. at *9.  In so ruling, the Prado court reached the common-sense conclusion that it should remand to the plan administrator for the administrator's determination of facts for the period where LTD benefits are requested but where information to establish disability is lacking from the record before the court.  Id.

The court finds the record before it is sufficient to establish that Plaintiff was disabled under the Plan for the entirety of the 180-day elimination period and until the Plan's final determination of ineligibility for LTD benefits on September 17, 2007.  Beyond that date, the court finds it lacks information sufficient to make a determination.  Plaintiff's complaint requests payment of LTD benefits paid up to the date of the time of trial in this manner.  The

court recognizes that the parties are entitled to as timely a resolution to this matter as can be reasonably had.  In the interests of efficient administration of justice, the court will order the parties to meet and confer to determine if the state of discovery in this case is such that the parties can proceed to a determination of the remainder of Plaintiff's claims by way of a motion for summary judgment.  Given that Plaintiff is entitled to the *de novo* review of any subsequent denial of LTD benefits, the court will grant leave to modify the scheduling order to accommodate motions and/or cross motions for summary judgment if the parties so stipulate.

THEREFORE, in accord with the foregoing discussion, it is hereby ORDERED that:

1.   Plaintiff is entitled to LTD benefits for the time period until September 17, 2007.  The parties shall meet and confer to determine the amount owed.  Any stipulation as to the amount owed shall be filed and served not later than twenty-one (21) days from the date of service of this order.  In the event the parties cannot stipulate to an amount, the parties shall file simultaneous briefs on the issue not later than twenty-one (21) days from the date of this order.  Simultaneous oppositions, if any, may be filed not later than twenty-eight (28) days from the date of service of this order.

2.   Plaintiff is entitled to interim attorney's fees pursuant to Smith v. CMTA-IAM Pension Trust, 746 F.2d 587, 589 (9th Cir. 1984).  Plaintiff's attorney shall submit a proposed order for attorney's fees not later than fourteen (14) days from the date of this order.  Defendant's opposition, if any, shall be filed not less than seven (7) days from the date of filing of Plaintiff's attorney's proposed order.

3.   The parties shall meet and confer to determine what issues remain unresolved and whether such issues may be addressed by way of motions or cross-motions for summary judgment.  The parties shall file a Joint Notice of Intent to Proceed not later than twenty-eight days from the date of service of this order in which they shall

inform the court of their intent to proceed by way of summary judgment motion or by way of remand.

IT IS SO ORDERED.

**Dated:    May 26, 2010**                          **/s/ Anthony W. Ishii**
                                                        CHIEF UNITED STATES DISTRICT JUDGE

24